IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 118,120

STATE OF KANSAS,
*Appellee*,

v.

SHERMAN NORMAN JENKINS,
*Appellant*.

SYLLABUS BY THE COURT

1.

The seven-factor test for authenticating an audio recording outlined in *State v. Williams*, 235 Kan. 485, 681 P.2d 660 (1984), is no longer controlling in Kansas. Audio recordings qualify as writings under the Kansas Rules of Evidence, K.S.A. 60-401 et seq.

2.

Under the rules of evidence, K.S.A. 60-401 et seq., the authentication requirement for a writing is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims. The burden of authentication is minimal or slight, and there is no precise formula for district judges to determine authenticity. Indirect or circumstantial evidence can suffice. A proponent need only proffer evidence upon which a reasonable juror could conclude that an audio recording is what the proponent represents it to be. Such evidence may include the content of the recordings. Discrepancies and other conflicting evidence go to the weight, not the admissibility, of the recordings.

3.

On the record in this case, the district judge did not abuse his discretion in admitting jail telephone call recordings into evidence.


4.

The phrase "moving violations" in K.S.A. 2015 Supp. 8-1568(b)(1)(E), Kansas' fleeing and eluding statute, is not unconstitutionally vague.


Appeal from Shawnee District Court; MARK S. BRAUN, judge. Opinion filed January 10, 2020. Affirmed.

*Korey A. Kaul*, of Kansas Appellate Defender Office, argued the cause, and was on the brief for appellant.

*Steven J. Obermeier*, assistant solicitor general, argued the cause, and *Derek Schmidt*, attorney general, was with him on the brief for appellee.

The opinion of the court was delivered by

BEIER, J.: Sherman Norman Jenkins led police on two separate vehicle chases in one night. The second chase ended in a fatal crash. A jury convicted Jenkins of first-degree felony murder, two counts of aggravated battery, two counts of felony fleeing and eluding police, one count of theft, one count of driving without tail lamps, and one count of driving while suspended.

Jenkins directly appeals his convictions to this court, raising two arguments. First, he argues that the district court judge erred by admitting as evidence recorded jail calls made using Jenkins' assigned personal identification number. We hold that the calls were properly admitted.

Second, Jenkins challenges the constitutionality of one of the options within a means of the felony fleeing and eluding statute. We reject his contention that the provision is unconstitutionally vague.

We therefore affirm.

FACTUAL AND PROCEDURAL HISTORY

During the early morning hours of February 4, 2016, Topeka-area law enforcement participated in two different vehicle pursuits.

The first pursuit involved a minivan and began shortly before 3 a.m. The van drove eastbound on Interstate 70 from Topeka and did not pull over, despite a law enforcement officer's use of lights and sirens. After the van accelerated to 90 miles per hour, the pursuit was called off. A different officer reinitiated pursuit after he observed the van make a U-turn at the I-70 toll plaza parking lot and return westbound toward Topeka. During this pursuit, the van's driver ran a red light, twice failed to signal before exiting, and failed to stop at three stop signs. The pursuit ended in North Topeka, where the van went off-road and crashed. Law enforcement did not find the van's driver at the scene of the crash but did find a female passenger in the van.

The second chase was set in motion a little after 4 a.m., when Craig Droge realized that someone had stolen his friend Donella Davidson's pickup from outside his home in North Topeka.

About an hour later, Officer Kurtis VanDonge noticed a pickup driving in North Topeka with nonoperational taillights. He followed the pickup and activated his lights, then his siren, and eventually his public announcement system. Despite this, the pickup's driver did not pull over. VanDonge's bodycam recorded the ensuing pursuit, which took a

3

circuitous route through North Topeka before crossing the Kansas Avenue bridge into downtown Topeka.

During this pursuit, the pickup's driver committed numerous moving violations. He twice turned into an incorrect lane, three times failed to maintain a single lane, drove on the left side of a two-way street, three times failed to come to a complete stop at a stop sign, and turned left through a red light. The driver also maneuvered around at least one set of stop sticks placed in the road by law enforcement. The pursuit ended when the pickup ran a red light at the intersection of Sixth Street and Topeka Boulevard and hit two cars. The crash injured Danny Williams Jr. and Benjamin Falley, the drivers of the two cars. It killed Mia Holden, a passenger in Falley's car.

Immediately after the crash, police officers removed the driver and only occupant from the pickup. This person was later identified as defendant Jenkins. Jenkins was taken to the hospital, then moved to the Shawnee County Jail.

The State charged Jenkins with first-degree felony murder, felony fleeing and eluding, theft, two counts of aggravated battery, driving without taillights, and driving with a suspended license.

At the jail, Jenkins was assigned a unique personal identification number (PIN) to be used to make outgoing calls on the jail's Securus telephone system. Jenkins' PIN was used to make six calls on February 5, 2016.

A detective listened to recordings of these calls. There were two primary speakers, one male and one female. The male speaker on the calls discussed not only the pickup chase and fatal crash, but also the earlier van chase. As a result, the State charged Jenkins with a second count of felony fleeing and eluding for the van chase.

4

At trial multiple law enforcement officers detailed their involvement with the chases and subsequent investigation. Officers Josh Miller and Joshua Franco described their pursuit of the van and the multiple moving violations they witnessed. The State played VanDonge's bodycam footage of the pursuit of the pickup while VanDonge narrated, explaining each moving violation he witnessed as it appeared onscreen.

Lieutenant Matt Biltoft from the Shawnee County Department of Corrections testified about the Securus software system. He said that each inmate is assigned a unique PIN when admitted to the jail. Inmates must use a PIN to make an outgoing call. The Securus software system records each outgoing call. Biltoft, as a Securus operator, can search the system using an inmate's name or PIN and identify all outgoing calls made with the inmate's PIN. When Biltoft searched the Securus system for all calls made with Jenkins' assigned PIN, he found six calls made using Jenkins' PIN on February 5, 2016. He listened to the calls and noted that "it was all similar information." Biltoft said that he did not know Jenkins' voice from any previous interactions and that he did not know who the other speakers on the calls were.

The State moved to introduce recordings of five calls into evidence. Jenkins objected; he argued that the State failed to sufficiently identify him as the male speaker on the calls. The district judge ruled that the State sufficiently established the identities of the speakers and overruled Jenkins' objection. The district judge stated:

> "[T]he circumstances and the nature of the recordings themselves identifies the authenticity and the identity of Mr. Jenkins speaking because this is the day after the fatality crash and there are statements made by Mr. Jenkins recognizing that he had been in that collision and that he had killed a woman in that collision.
>
> "So circumstantially, the odds that another person on the 5th of February calls up his girlfriend and confesses to being in a high-speed pursuit the night before in which a

5

woman was killed is highly unlikely to the point where there's sufficient basis now for the Court to say this is an authentic copy of those jail calls."

The State published the calls during Detective Jesse Sherer's testimony. Sherer said that during the six phone calls Jenkins made to a woman referred to as "Connie," Jenkins "accurately speaks about the facts of both chases that occurred in the morning of February 4th, including the types of vehicles that were involved, the general locations of where those chases occurred, how they occurred," and even "mentions stealing a truck and that it was involved in an accident at the location of the Sixth and Topeka accident." Sherer also testified that in one call Jenkins admitted fleeing on foot from the location of the van crash. In addition, Sherer said, according to Department of Motor Vehicle records, Jenkins' driver's license was revoked at the time of the two pursuits.

Officer Ross Gustafson testified that the Vehicle Identification Number on the pickup identified it as belonging to Davidson. And the Shawnee County coroner testified that Holden died from several lethal injuries caused by the crash.

Jenkins did not put on any evidence.

The district judge gave the jury two separate fleeing and eluding instructions, one for each charge. In the first instruction—pertaining to the pickup pursuit—the district judge instructed the jury about four possible options within a means by which Jenkins may have committed felony fleeing and eluding: driving around a tire deflating device placed by a police officer (K.S.A. 2015 Supp. 8-1568[b][1][B]); engaging in reckless driving (K.S.A. 2015 Supp. 8-1568[b][1][C]); involvement in a motor vehicle accident (K.S.A. 2015 Supp. 8-1568[b][1][D]); and committing five or more moving violations (K.S.A. 2015 Supp. 8-1568[b][1][E]). This instruction also defined "reckless driving." In the second fleeing and eluding instruction—pertaining to the van pursuit—the district judge listed only one option within a means: committing five or more moving violations.

6

The district judge also instructed the jury about the definition of "moving violations," taking language from K.A.R. 92-52-9(a). The instruction said that "moving violations" included:

- Driving with a suspended, canceled, or revoked license. (K.S.A. 8-262)
- Failing to stop at a stop sign. (K.S.A. 8-1528[b])
- Failing to stop at a red light. (K.S.A. 8-1508[c])
- Failing to maintain a single lane. (K.S.A. 8-1522[a])
- Driving in the left lane while approaching a hill, curve, intersection, or railroad grade crossing. (K.S.A. 8-1519)
- Making an unsafe turn or lane change. (K.S.A. 8-1548)
- Turning into the incorrect lane. (K.S.A. 8-1545)
- Failing to signal a turn or lane change. (K.S.A. 8-1548)

During the portion of its closing addressing fleeing and eluding, the State addressed only the pickup pursuit and not the van pursuit. The State argued that Jenkins committed eight moving violations during the pickup chase: driving with a revoked license, failing to stop at a stop sign, failing to stop at a red light, failing to maintain a single lane, driving on the wrong side of the road, failing to signal a turn, making an improper turn, and failing to signal another turn or lane change. The State directed the jury to VanDonge's bodycam footage and testimony as evidence of these violations.

The jury found Jenkins guilty on all eight counts. The district judge merged the felony fleeing and eluding conviction pertaining to the pickup pursuit into the felony-murder conviction and thus sentenced Jenkins on only seven counts. Jenkins received a sentence of life without parole for at least 25 years for first-degree murder. His sentences

on the remaining counts totaled 56 months and 5 days; the district judge ran those sentences concurrent to each other but consecutive to the life sentence.

Jenkins timely appealed.

DISCUSSION

Jenkins first argues on appeal that he is entitled to a new trial because the district judge erred by admitting the jail phone calls into evidence. Second, he argues that K.S.A. 8-1568(b)(1)(E), the option within a means of the felony fleeing and eluding statute dependent on five or more moving violations, is unconstitutionally vague. As a result, he argues, this court must reverse his convictions for felony fleeing and eluding and felony murder. We address each question in turn.

*Admission of Jail Calls*

Because Jenkins objected during trial to the admission of the jail calls on the ground that the State failed to lay a sufficient foundation, the same weakness he asserts on appeal, he preserved this issue for our review. See K.S.A. 60-404.

On review of

"a decision to admit evidence, appellate courts consider first whether the evidence is relevant. . . . If the court finds the evidence is relevant, the second step requires the court to apply the statutory rules governing the admission or exclusion of evidence. [Citations omitted.]" *State v. Phillips*, 295 Kan. 929, 947, 287 P.3d 245 (2012).

Here, Jenkins does not contest the relevance of the calls, nor does he assert that the recordings contain inadmissible hearsay. Cf. *State v. Williams*, 306 Kan. 175, 392 P.3d 1267 (2017) (holding informant's recorded statements were testimonial hearsay). He

8

challenges only the district judge's application of the rules for their admission, specifically whether the State laid an adequate foundation.

> "The question of whether evidentiary foundation requirements have been met is left largely to the discretion of the district court. Under an abuse of discretion standard, an appellate court will not disturb a district court's decision unless no reasonable person would have taken the same view. [Citations omitted.]" *State v. Ernesti*, 291 Kan. 54, 64-65, 239 P.3d 40 (2010).

A district judge's mistake of fact or law also qualifies as an abuse of discretion. *State v. Jolly*, 301 Kan. 313, 325, 342 P.3d 935 (2015).

This court reviews the factual underpinnings of a district judge's legal ruling for substantial competent evidence. *City of Overland Park v. Cunningham*, 253 Kan. 765, Syl. ¶ 6, 861 P.2d 1316 (1993). "Substantial competent evidence is 'evidence which possesses both relevance and substance and which furnishes a substantial basis of fact from which the issues can reasonably be resolved.'" *State v. Brown,* 300 Kan. 542, 546, 331 P.3d 781 (2014) (quoting *In re D.D.M.,* 291 Kan. 883, 893, 249 P.3d 5 [2011]).

Jenkins argues that the State insufficiently established that he was the male speaker on the recorded calls. In his view, the State cannot rely entirely on the use of his PIN to establish his identity.

The State argues that it sufficiently established Jenkins' identity through Biltoft's testimony that the PIN was unique and assigned only to Jenkins. The State further argues that any doubt Jenkins sought to sow about use of his PIN by another inmate goes to the weight of the evidence, not to its admissibility. The State also points out that it furnished other evidence of identity beyond Jenkins' PIN. And it suggests that voice identification requirements set out in *State v. Williams*, 235 Kan. 485, 681 P.2d 660 (1984), have become dated while the state of the law surrounding audio recordings has changed.

In *Williams*, this court identified seven factors from the then-current American Jurisprudence treatise that should be used to establish a foundation for an audio recording.

"'The cases are in general agreement as to what constitutes a proper foundation for the admission of a sound recording, and indicate a reasonably strict adherence to the rules prescribed for testing the admissibility of recordings, which have been outlined as follows: (1) a showing that the recording device was capable of taking testimony; (2) a showing that the operator of the device was competent; (3) establishment of the authenticity and correctness of the recording; (4) a showing that changes, additions, or deletions have not been made; (5) a showing of the manner of the preservation of the recording; (6) identification of the speakers; and (7) a showing that the testimony elicited was voluntarily made without any kind of inducement.' 29 Am. Jur. 2d, Evidence § 436, pp. 494-95." 235 Kan. at 491.

The *Williams* court noted that "[w]hile Kansas cases vary in terms of what has been found to be sufficient foundation for the admission of recordings into evidence, all cases agree the matter is within the discretion of the trial court." 235 Kan. at 491. Under this standard, admission of a re-recorded tape of a 911 call was proper because evidence demonstrated that the cassette recorder operators were competent, that the operators listened to the recording as it occurred and testified to the re-recording's accuracy, that the victim identified her and the defendant's voices on the tape, and that the State established an appropriate chain of custody. 235 Kan. at 491-93.

It appears the seven factors this court found in the American Jurisprudence treatise originated in a 1955 Georgia Court of Appeals decision, *Steve M. Solomon, Jr., Inc. v. Edgar*, 92 Ga. App. 207, 211-12, 88 S.E.2d 167 (1955). From there, they spread to other state and federal courts. See *United States v. McKeever*, 169 F. Supp. 426, 430 (S.D.N.Y. 1958), *rev'd on other grounds* 271 F.2d 669 (2d Cir. 1959); *State v. Williams*, 49 Wash.

10

2d 354, 360, 301 P. 2d 769 (1956). And secondary sources such as the 1958 American Law Reports and American Jurisprudence treatise started listing the seven factors as well. Annot., 58 A.L.R.2d 1024, 1027-28.

Since *Williams*, 235 Kan. 485, was decided in 1984, this court and our Court of Appeals have routinely cited it for the standard for admission of audio recordings. See *State v. Snow*, 282 Kan. 323, 329-30, 144 P.3d 729 (2006); *State v. Milton*, No. 99,584, 2010 WL 5139871, at *5 (Kan. App. 2010) (unpublished opinion). However, several panels of our Court of Appeals have expressed concern that the *Williams* requirements "may be obsolete" and have "been abandoned in other jurisdictions in better-reasoned cases that favor a rule holding that recordings, like photographs, are admissible when a witness testifies they are reliable representations of the subject sound." *State v. Vogt*, No. 106,487, 2013 WL 310343, at *4 (Kan. App. 2013) (unpublished opinion); see also *State v. Kemp,* 30 Kan. App. 2d 657, 662-63, 46 P.3d 31 (2002); *State v. Miles*, No. 110,511, 2014 WL 7565767, at *7 (Kan. App. 2014) (unpublished opinion).

Jurisdictions that have abandoned the seven requirements include Kentucky, Michigan, Mississippi, and Texas. See *Campbell v. Commonwealth*, 788 S.W.2d 260 (Ky. 1990); *People v. Berkey*, 437 Mich. 40, 51-52; 467 N.W.2d 6 (1991); *Stromas v. State*, 618 So. 2d 116, 118 (Miss. 1993); *Angleton v. State*, 971 S.W.2d 65, 68-69 (Tex. Crim. App. 1998).

Still other jurisdictions never adopted the seven-factor test in the first place, or they treated them as mere guidelines. See *State v. Weatherly*, 519 N.W.2d 824, 826 (Iowa Ct. App. 1994) ("Iowa has not adopted the 'particularized technical' test . . . . 'What has been required is that the foundation for the evidence clearly establish that it is accurate and trustworthy.'"); *State v. Jackson*, 113 Wash. App. 762, 767-68, 54 P.3d 739 (2002) (recognizing adapted version of seven factors as one of several acceptable methods to authenticate audio recording); *People v. Gonzales*, No. 16CA0750, 2019 WL 1087008, at

11

*3 (Colo. App. 2019) (unpublished opinion) (rejecting use of one set of factors for authenticating sound recordings; holding district judges have "broad discretion to consider a variety of factors and circumstances" for authentication). The Tenth Circuit has recognized that the factors "may assist judges when ruling on foundation questions, [but] they are not prerequisites to the admission of sound recordings." *United States v. Green*, 175 F.3d 822, 830 n.4 (10th Cir. 1999). The Third Circuit wrote recently that it uses the factors but "did not intend to establish 'a uniform standard equally applicable to all cases.'" *United States v. Credico*, 718 Fed. Appx. 116, 119 (3d Cir. 2017) (unpublished opinion). And the Seventh Circuit has rejected "formalistic" use of factors in favor of "the more inclusive approach of Federal Rule of Evidence 901(a)." *United States v. Westmoreland*, 312 F.3d 302, 310 (7th Cir. 2002).

Even *Williams*' cited source for the factors, American Jurisprudence, has moved away from the seven-factor test. The current Volume 23 of American Jurisprudence Proof of Facts 3d 315 states at Section 22, p. 373: "[S]trict adherence to the 'seven-pronged' predicate has been significantly relaxed, and today a minimally sufficient foundation can be laid in a variety of ways that require far less than the satisfaction of all seven prongs." It posits:

> "Perhaps the best way to establish a minimal sufficient foundation is through testimony as to the recording's accuracy by a nonparticipant who overheard the conversation as it occurred, either through physical presence or electronic monitoring. Other methods that courts have found to satisfy minimal sufficient foundation requirements include a participant's testimony that the recording is accurate, an independent determination by the trial judge that the recording is accurate, evidence as to chain of custody, or testimony of a participant in the conversation together with proof by an expert witness." 23 Am. Jur. 3d *Proof of Facts* 315 § 35, pp. 401-02.

In spite of these developments in the law, some jurisdictions continue to use the seven factors listed in *Williams*. These jurisdictions include Louisiana, Minnesota,

Missouri, and Montana. See *State v. Jones*, 46 So. 3d 756, 762 (La. Ct. App. 2010); *Turnage v. State*, 708 N.W.2d 535, 542 (Minn. 2006); *State v. Patrick*, 566 S.W.3d 245, 253 (Mo. Ct. App. 2019); *McCormick v. Brevig*, 322 Mont. 112, 132, 96 P.3d 697 (2004) (this civil case excludes the seventh "voluntariness" factor but the voluntariness factor is included in previous criminal cases, see, e.g., *City of Missoula v. Forest*, 236 Mont. 129, 134, 769 P.2d 699 [1989]).

Other jurisdictions use the seven factors or similar lists of factors only in "silent witness" situations. Alabama uses seven requirements very similar to those from *Williams* when "there is no qualified and competent witness who can testify that the sound recording or other medium accurately and reliably represents what he or she sensed at the time in question." *Bohannon v. State*, 222 So.3d 457, 494 (Ala. Crim. App. 2015). The Alabama Court of Criminal Appeals has held that a recorded jail call was properly authenticated when

> "the prosecutor laid the proper predicate for the admissibility of [defendant Brandon D.] Mitchell's November 8, 2006, telephone conversation from the Jefferson County jail. Deputy Carl Carpenter of the Jefferson County Sheriff's Department testified about the machine used to digitally record inmates' telephone calls from the jail and how the conversations are stored on an inmate-telephone server. Carpenter's testimony established that he was competent to operate the recording system. Additionally, Carpenter described how the system worked, described how he downloaded the conversation from the inmate-telephone server to a compact disc ('CD'), and stated that the CD accurately represented the telephone conversation that was stored on the server. Carpenter further testified that there were no changes to the recording. The testimony presented at trial further established the telephone call in question was traced to Mitchell's assigned pin number, Mitchell referred to himself as 'Brandon' during the conversation, and Mitchell spoke of details known only by Mitchell. Finally, Carpenter testified that before placing the telephone call, Mitchell was adequately warned that his conversation might be recorded and that Mitchell's statements were voluntary and not part of a custodial statement to law-enforcement officers." *Mitchell v. State*, 84 So. 3d 968, 1008 (Ala. Crim. App. 2010).

13

In a "silent witness" situation in Illinois, "a recording may be admitted without the testimony of a witness with personal knowledge of what the recording portrays[,] as long as there is sufficient proof of the reliability of the process that produced the recording." *People v. Sangster*, 8 N.E.3d 1116, 1127 (Ill. App. Ct. 2014). "[A] sound recording, which is otherwise competent, material, and relevant, is admissible into evidence if a proper foundation is laid establishing the authenticity and reliability of the recording." *Sangster*, 8 N.E.3d at 1127. Five evidentiary factors are used to establish authenticity in such circumstances:  "(1) capability of the device for recording; (2) competency of the operator; (3) proper operation of the device; (4) preservation of the recording with no changes, additions, or deletions; and (5) identification of the speakers." *People v. Smith*, 321 Ill. App. 3d 669, 675, 749 N.E.2d 986 (2001); *People v. Viramontes*, 69 N.E.3d 446, 460 (Ill. App. Ct. 2017).

This case qualifies as even more silent than the "silent witness" cases before the Alabama and Illinois courts. In *Sangster* and *Mitchell*, the speakers in the audio recordings were identified by name during the calls. In this case, the male speaker on the calls identified himself only as "Ricky." The State sponsored no evidence to show that Jenkins went by that name, and Jenkins sponsored no evidence to show that another person named Ricky had knowledge of Jenkins' PIN.

That said, the most recent edition of McCormick on Evidence also embraces the possibility of admission of audio recordings in a "silent witness" situation, with no emphasis on the seven-factor test this court used in *Williams*. "If no witness testifies that he overheard the crucial information being recorded, then the record must be authenticated by the 'silent witness' process; that is, testimony concerning the accuracy of the recording system and the absence of tampering, often through its chain of custody." 2 McCormick on Evidence § 216, p. 44 (7th ed. 2013).

14

Our review of these diverse authorities counsels an overhaul of the *Williams* seven-factor foundation test for admission of audio recordings. The question then becomes how to formulate its replacement.

Fortunately, we are guided in this endeavor by our modern embrace of a text-first approach to statutory interpretation and construction. See *Redd v. Kansas Truck Center*, 291 Kan. 176, 188, 239 P.3d 66 (2010) (when interpreting statutes, courts first look to language of statutes). And this approach is reinforced by our observation that several of our sister states have rejected mechanical application of the seven factors because of jurisdiction-specific evidentiary statutes or rules. See, e.g., *Gonzales*, 2019 WL 1087008, at *3 (Colorado); *Berkey*, 437 Mich. at 51-52.

Under Kansas' Rules of Evidence, codified in K.S.A. 60-401 et seq., audio recordings such as those at issue here qualify as "writings." See K.S.A. 60-401(m) ("'Writing' means . . . every other means of recording upon any tangible thing any form or communication or representation, including . . . sounds."); *State v. Dale*, 293 Kan. 660, 662-63, 267 P.3d 743 (2011) (video on digital versatile disc constitutes writing; "it is a means of recording upon a tangible thing . . . a combination of moving pictures and sounds"). "Authentication of a writing is required before it may be received in evidence," and it may be established by "evidence sufficient to sustain a finding of its authenticity or by any other means provided by law." K.S.A. 60-464.

In *State v. Robinson*, 303 Kan. 11, 225, 363 P.3d 875 (2015), *disapproved of on other grounds by State v. Cheever*, 306 Kan. 760, 402 P.3d 1126 (2017), this court interpreted K.S.A. 60-464 and held that its "authentication requirement is 'satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims.'" 303 Kan. at 225. The burden of authentication is "minimal" or "slight," and there is "no precise formula" for district judges to determine authenticity. 303 Kan. at 225. "[I]ndirect or circumstantial evidence" can suffice. 303 Kan. at 225. A proponent

15

need only proffer evidence upon which a reasonable juror could conclude that the message is what the proponent represents it to be. 303 Kan. at 226. After that, "discrepancies and other conflicting evidence go to the weight, not the admissibility, of the writing." 303 Kan. at 226.

Further, in the much earlier case of *State v. Milum*, 202 Kan. 196, 198, 447 P.2d 801 (1968), this court held that a letter can be authenticated by its contents when "the contents themselves reveal knowledge peculiarly referable to a certain person or the contents are of such nature that the letter could not have passed between persons other than the purported writer and the person to whom it was delivered." Likewise, the content of an audio recording can contribute to its authentication.

In this case, even when we are careful to focus only on the question of the identity of the caller rather than the identity of the guilty party, the State proffered plenty of evidence upon which a reasonable juror could conclude that Jenkins made the recorded calls. The use of Jenkins' unique PIN to make the calls certainly is strong circumstantial evidence that Jenkins was the caller. And the State had much more. The calls' content included the male caller's discussion of being in the hospital, and previous testimony had established that Jenkins was taken to the hospital after the pickup crash. The male caller also discussed the crash itself, and prior testimony had established that Jenkins was the only person in the pickup at the time of the crash. And, finally, as the district judge pointed out, the timing of the calls the day after the crash made Jenkins more likely to have made them.

On this record, under current Kansas rules of evidence and the cases interpreting them, we hold that the district judge did not abuse his discretion by admitting the recorded calls as evidence in Jenkins' trial.

*K.S.A. 2015 Supp. 8-1568(b)(1)(E) Vagueness*

Jenkins argues that this court must reverse his felony fleeing and eluding and felony-murder convictions because the term "moving violations" used in the Kansas felony fleeing and eluding statute is unconstitutionally vague.

The statute reads:

"Any driver of a motor vehicle who willfully fails or refuses to bring such driver's vehicle to a stop, or who otherwise flees or attempts to elude a pursuing police vehicle or police bicycle when given visual or audible signal to bring the vehicle to a stop, and who:

"(1) Commits any of the following during a police pursuit: . . . (E) commits five or more moving violations." K.S.A. 2015 Supp. 8-1568(b)(1)(E).

Oddly, the words necessary to complete the sentence begun in this passage are found in K.S.A. 2015 Supp. 8-1568(b)(2): ". . . shall be guilty as provided in subsection (c)(2)." Subsection (c)(2) states that violation of subsection (b) is a "severity level 9, person felony." This drafting and/or printing anomaly, although worth noting (and correcting), ultimately is irrelevant to whether the phrase challenged by Jenkins, i.e., "moving violations," is unconstitutionally vague.

Jenkins concedes that he did not raise a vagueness issue before the district court. And he appreciates that this court generally does not review constitutional claims raised for the first time on appeal. *State v. Godfrey*, 301 Kan. 1041, 1043, 350 P.3d 1068 (2015). He argues that this is a case in which, in our discretion, we should apply an exception. See *State v. Robinson*, 306 Kan. 1012, 1025, 399 P.3d 194 (2017). Jenkins contends this court should consider his vagueness argument because "consideration of the theory is necessary to serve the ends of justice or to prevent the denial of fundamental rights."

17

*State v. Phillips*, 299 Kan. 479, 493, 325 P.3d 1095 (2014). We agree to apply the exception and move to the merits of his argument.

"A claim that a statute is void for vagueness necessarily requires a court to interpret the language of the statute in question to determine whether it gives adequate warning as to the proscribed conduct." *State v. Richardson*, 289 Kan. 118, 124, 209 P.3d 696 (2009). Questions of statutory interpretation are subject to unlimited review by this court. *State v. Looney*, 299 Kan. 903, Syl. ¶ 2, 327 P.3d 425 (2014).

Due process requires criminal statutes to "convey[] a sufficiently definite warning as to the conduct proscribed when measured by common understanding and practice." *State v. Dunn*, 233 Kan. 411, 418, 662 P.2d 1286 (1983). "[T]he determinative question" when statutes are challenged as void for vagueness is "'whether a person of ordinary intelligence understands what conduct is prohibited by' the statutory language at issue." *Richardson*, 289 Kan. at 125 (quoting *State v. Adams*, 254 Kan. 436, 445, 866 P.2d 1017 [1994]). We employ a two-pronged inquiry, asking: "(1) whether the statute gives fair warning to those potentially subject to it; and (2) whether it adequately guards against arbitrary and unreasonable enforcement." *State v. Gonzalez*, 307 Kan. 575, 580, 412 P.3d 968 (2018).

"[S]tatutes are not 'automatically invalidated as vague simply because difficulty is found in determining whether certain marginal offenses fall within their language.'" *Hearn v. City of Overland Park*, 244 Kan. 638, 641, 772 P.2d 758 (1989) (quoting *Parker v. Levy*, 417 U.S. 733, 757, 94 S. Ct. 2547, 41 L. Ed. 2d 439 [1974]). This court generally presumes statutes are constitutional and resolves all doubts in favor of a statute's validity. *Gonzalez*, 307 Kan. at 579.

Jenkins, as the party challenging the statute as unconstitutional, bears the burden to overcome the presumption of constitutionality. *Gonzalez,* 307 Kan. at 579.

18

Jenkins primarily relies on *State v. Richardson*, 290 Kan. 176, 180, 244 P.3d 553 (2010), to support his vagueness challenge.

In *Richardson*, defendant Dorian Richardson challenged his conviction for felony fleeing and eluding. At trial, the State had produced evidence that Richardson "[ran] through five stop signs and a red light, turn[ed] without a turn signal five times, [drove] in the wrong lane twice, and [drove] as much as 40 miles per hour over the speed limit" while police pursued him. 290 Kan. at 177. The district judge instructed the jury only about the "five or more moving violations" option within a means for fleeing and eluding. 290 Kan. at 179. The district judge did not define "moving violation" for the jury.

Because Richardson had not requested such an instruction or objected to the lack of it in district court, an appellate clear error standard of review applied. 290 Kan. at 178. This court concluded that such error existed in Richardson's case, because the fleeing and eluding statute did not define "moving violations" and "[t]he definition of moving violation [was] not a simple matter of common knowledge among jurors." 290 Kan. at 181.

It is obvious that *Richardson*'s holding is not directly helpful to Jenkins, because it concerned an instructional error rather than a vagueness challenge. Jenkins does not and cannot assert instructional error here, because his trial judge supplied the jury with specific definitions of the eight different moving violations relied on by the prosecution.

Instead, Jenkins wishes to put *Richardson*'s observation that the definition of moving violation is "not intuitive" and "not a simple matter of common knowledge among jurors," 290 Kan. at 180-81, to work in the service of his arguments that K.S.A. 2015 Supp. 8-1568(b)(1)(E) does not give "fair warning to those potentially subject to it" and does not "adequately guard[] against arbitrary and unreasonable enforcement."

19

*Gonzalez*, 307 Kan. at 580. He places particular emphasis on the *Richardson* decision's language about where jurors might have looked for a definition of "moving violations" when one was not included in their instructions:

> "K.S.A. 8-249(b), relating to records to be maintained by the Kansas Department of Revenue, Division of Motor Vehicles, requires the division to maintain records of individual licensees' 'convictions of moving violations as defined by rules and regulations adopted by the secretary of revenue.'

> "Certain statutes explicitly refer to the rules and regulations adopted pursuant to K.S.A. 8-249. See K.S.A. 8-2004(c), relating to traffic-control devices on state highways; K.S.A. 8-2118(e), relating to a uniform fine schedule for traffic infractions; and K.S.A. 28-172a(b), relating to docket fees.

> "Other statutes, including the subject of the present appeal, K.S.A. 8-1568, refer to moving traffic violations without reference to other rules and regulations. See K.S.A. 8-237(a), relating to restricted licenses; K.S.A. 8-255(a), relating to restricting or removing driving privileges; K.S.A. 8-296(g), relating to farm permits; and K.S.A. 40-277(c)(7), relating to automobile liability insurance policies.

> "Certain traffic violations are excluded by statute from application to other statutory provisions relating to moving violations. K.S.A. 8-1345(a) specifically excludes certain violations relating to child-passenger safety from being considered moving traffic violations as they relate to K.S.A. 8-255(a). K.S.A. 8-1560c, relating to violating maximum speed limits, likewise specifically limits certain speeding violations from being treated as moving traffic violations for purposes of K.S.A. 40-277(c). And K.S.A. 8-1742b excludes violations relating to restrictions on wide-base single tires from the definition of moving traffic violations under K.S.A. 8-255(a).

> "The administrative regulations are also not in agreement as to what constitutes a moving violation. K.A.R. 82-4-1(t), relating to the Kansas Corporation Commission, defines a moving violation with respect to motor carriers as 'the commission or omission of an act by a person operating a motor vehicle that could result in injury or property

20

damage and that is also a violation of a statute, ordinance, or regulation of this or any other state.' That definition is more open-ended than the definition of moving violation contained in K.A.R. 92-52-9, promulgated by the Kansas Department of Revenue, Motor Vehicle Drivers' Licenses Division pursuant to K.S.A. 8-249, which enumerates multiple Kansas statutory offenses, including violations of corresponding municipal ordinances or county resolutions in this state or similar statutes, ordinances, or regulations in other states, that constitute moving violations." 290 Kan. at 180-81.

It is true that K.S.A. 2015 Supp. 8-1568(b)(1)(E) does not explicitly define "moving violations" or refer to other statutes or regulations that do, but this does not mean that such provisions do not exist. They do. The *Richardson* decision said as much. And, in a paragraph immediately following the quoted observations Jenkins emphasizes, *Richardson* expressly disclaimed an intention to resolve what constituted a moving violation, as that question was not before it. It noted only that "statutes and regulations present a complex statement of what is considered a moving violation for particular purposes." 290 Kan. at 181.

K.S.A. 2015 Supp. 8-234b(d), part of the Motor Vehicle Drivers' License Act, states that the "secretary of revenue shall adopt rules and regulations establishing qualifications for the safe operation of . . . vehicles." K.S.A. 2015 Supp. 8-249(b) requires the Division of Motor Vehicles (DMV) to "maintain convenient records or make suitable notations in order that an individual record of each licensee *showing the convictions of moving violations, as defined by rules and regulations adopted by the secretary of revenue*, of such licensee . . . shall be readily ascertainable." (Emphasis added.) Together these two statutes unambiguously state legislative intent for the Secretary of Revenue to promulgate regulations defining "moving violations" and for the DMV to keep track of individual driving records.

The Secretary of Revenue did exactly as instructed by the Legislature in K.A.R. 92-52-9. K.A.R. 92-52-9 refers to a list of Kansas statutes and states unequivocally that

21

violations of these statutes constitute moving violations. K.A.R. 92-52-9(a) also classifies violation of "any other Kansas Statute that specifically provides that a conviction for violation of such statute is a moving violation" as a Kansas moving violation. And it designates violation of any "similar municipal ordinance or county resolution in this state" or "any similar statute, municipal ordinance, or regulation in another state" as a Kansas moving violation as well. K.A.R. 92-52-9(a)(1)(GG)-(a)(3). Each moving violation in the detailed jury instructions given at Jenkins' trial was based on a Kansas statute specifically listed in K.A.R. 92-52-9(a).

Thus, although the statutory and regulatory scheme defining "moving violation" can be described as "complex," to use *Richardson*'s word, because it may require reference to more than one legal provision, it is far from unconstitutionally vague. K.S.A. 2015 Supp. 8-1568(b)(1)(E), when understood in context "provide[s] a person of ordinary intelligence with fair notice" of what conduct is forbidden. *State v. Williams*, 308 Kan. 1439, 1460, 430 P.3d 448 (2018); *Grayned v. City of Rockford*, 408 U.S. 104, 108-09, 92 S. Ct. 2294, 33 L. Ed. 2d 222 (1972). The conduct underlying each of the moving violations used by the jury to convict Jenkins of fleeing and eluding and felony murder was clearly prohibited by Kansas law: driving with a suspended, canceled, or revoked license (K.S.A. 2015 Supp. 8-262); failure to stop at a stop sign (K.S.A. 8-1528[b]); failure to stop at a red light (K.S.A. 2015 Supp. 8-1508[c]); failure to maintain a single lane (K.S.A. 2015 Supp. 8-1522[a]); driving in the left lane while approaching a hill, curve, intersection, or railroad grade crossing (K.S.A. 8-1519); making an unsafe turn or lane change (K.S.A. 8-1548); turning into the incorrect lane (K.S.A. 8-1545); and failing to signal a turn or lane change (K.S.A. 8-1548). Jenkins cannot meet his burden under the first prong of his vagueness challenge.

Jenkins' claim under the second vagueness prong that K.S.A. 8-1568(b)(1)(E)'s use of "moving violations" is "not precise enough to adequately protect [him] against arbitrary and discriminatory use of the law" also fails. Just as a person of ordinary

22

intelligence can understand what the phrase "moving violations" means, a law enforcement officer can understand the actions criminalized. The plain language of the defining statutory and regulatory provisions is clear. And Jenkins at least exaggerates when he asserts that "[t]he State used the words 'moving violation' to describe any violation of the traffic laws." During the portion of the State's closing argument Jenkins cites to support this assertion, the prosecutor specifically identified each moving violation it alleged. The district judge's specific instructions reinforced the prosecutor's description of Jenkins' offenses.

Finally, as part of his vagueness challenge, Jenkins argues that this court should consider and apply the rule of lenity. He points specifically to K.A.R. 82-4-1(aa), which, he says, limited "moving violations" to those that could result in injury or property damage and were violations of law.

The rule of lenity requires this court to adopt the interpretation of a criminal statute most favorable to the defendant when presented with "'two reasonable and sensible interpretations'" of that statute. *State v. Collins*, 303 Kan. 472, 476, 362 P.3d 1098 (2015).

There are several flaws in Jenkins' reliance on the rule of lenity.

First, K.A.R. 82-4-1 (2017 Supp.) is a regulation of the Kansas Corporation Commission rather than the Department of Revenue. Second, the Corporation Commission provision defining "moving violations" at the time of Jenkins' crimes was subsection (z) rather than (aa). See K.A.R. 82-4-1 (2017 Supp.) Third, although the *Richardson* decision mentioned the difference between the Department of Revenue's regulatory definition of "moving violations" and the Corporation Commission's regulatory definition of "moving violations," it also noted that the Corporation

Commission's regulatory power extended only to motor carriers. See K.S.A. 66-1,108a. A "motor carrier" was defined at the time of Jenkins' crimes to mean

> "any person operating as a for hire motor carrier or a private motor carrier, and any of that person's agents, officers, representatives, as well as employees responsible for hiring, supervising, training, assigning or dispatching of drivers and employees concerned with the installation, inspection and maintenance of motor vehicle equipment or accessories or both." K.S.A. 2015 Supp. 66-1,108(f).

Jenkins was not a motor carrier under this definition. We have already said that the clear statutes and regulations governing a driver like him were not ambiguous. They were not rendered ambiguous because other statues and regulations governing another type of driver say something else. There is nothing in this case to which the rule of lenity might apply.

CONCLUSION

Jenkins is not entitled to reversal of his convictions because of error in the admission of jail telephone call recordings or because the Kansas fleeing and eluding statute is unconstitutionally vague. We affirm the judgment of the district court.

BARBARA KAY HUFF, District Judge, assigned.[1]

---

[1]**REPORTER'S NOTE:** District Judge Huff was appointed to hear case No. 118,120 under the authority vested in the Supreme Court by art. 3, § 6(f) of the Kansas Constitution to fill the vacancy on the court by the retirement of Justice Lee A. Johnson.