NOT DESIGNATED FOR PUBLICATION

No. 121,909

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

ERION DIJON KIRTDOLL,
*Appellant.*

MEMORANDUM OPINION

Appeal from Shawnee District Court; DAVID DEBENHAM, judge. Opinion filed February 26, 2021. Affirmed.

*Hope E. Faflick Reynolds*, of Kansas Appellate Defender Office, for appellant.

*Kurtis Wiard*, assistant solicitor general, and *Derek Schmidt*, attorney general, for appellee.

Before ARNOLD-BURGER, C.J., BRUNS and POWELL, JJ.

PER CURIAM: After pleading guilty to reckless second-degree murder and aggravated robbery, but before sentencing, Erion Dijon Kirtdoll sought to withdraw his pleas. After an evidentiary hearing, the district court found that Kirtdoll had not established good cause to withdraw his pleas and denied his motions. Kirtdoll now appeals, claiming he did not fully understand the State's plea offer and that he felt rushed in accepting it. After a careful review of the record on appeal, we see no merit to Kirtdoll's arguments and affirm the district court's denial of Kirtdoll's motions to withdraw his pleas.

1

FACTUAL AND PROCEDURAL BACKGROUND

*The underlying crimes*

The facts are well known to the parties, so we only summarize the relevant ones. In February 2018, Kirtdoll and three other men robbed at gunpoint a donut shop in Topeka, Kansas. After completing this robbery, the four men then drove to a house in southeast Topeka where they attempted to rob the residents. The men forced their way into the home, and, eventually, Kirtdoll encountered a man in a back room, who drew a handgun to defend himself, but Kirtdoll shot and killed him.

These acts prompted the State to charge Kirtdoll with five crimes: one count of first-degree murder; two counts of aggravated robbery; one count of aggravated burglary; and one count of criminal possession of a firearm. Ultimately, these charges were set to be tried on January 28, 2019.

*Kirtdoll's pleas*

As his trial was approaching, on January 9, 2019, Kirtdoll and the State entered into a plea agreement. Kirtdoll agreed to plead guilty to one count of reckless second-degree murder—reduced from the charged first-degree murder—and one count of aggravated robbery. In exchange, the State agreed to dismiss the remaining three charges in this case, as well as dismiss pending charges in another, unrelated case.

The parties agreed to jointly request consecutive aggravated presumptive sentences for both counts. The plea agreement explained the parties expected Kirtdoll's criminal history score to be A, meaning if the district court followed the joint recommendation, he would receive a sentence of 493 months' imprisonment for the reckless second-degree murder charge and 61 months' imprisonment for the aggravated

robbery charge, to run consecutively for a total of 554 months' imprisonment. If the district court followed this agreement, Kirtdoll would be eligible for good time credit because he would be sentenced to a grid sentence. See K.S.A. 2020 Supp. 21-6620(a)(2); K.S.A. 2020 Supp. 21-6821(b). Kirtdoll initialed and signed the agreement.

The day after Kirtdoll signed the plea agreement, the district court held a plea hearing. After the State explained the agreements, the district judge engaged in an extensive colloquy with Kirtdoll, walking through the plea agreement and explaining his rights to him:

"THE COURT: Mr. Kirtdoll, is that your understanding of the plea agreement in this case?

"[KIRTDOLL]: Yes, sir.

"THE COURT: I'm gonna have you go ahead and have a seat. I have a number of questions to ask you.

"I have a written plea agreement. It consists of ten pages. It bears the signature of . . . Mr. Watson and Ms. Asher. It also . . . appears to bear your signature, and at each subsection there is a place for initials, and it appears to have your initials on each subsection.

"Are those your initials and your signature, sir?

"[KIRTDOLL]: Yes, sir.

"THE COURT: Okay. Did you have sufficient time to go over the written Plea Agreement with Ms. Asher?

"[KIRTDOLL]: Yes, sir.

"THE COURT: Do you have a sentencing grid, sir?

"[KIRTDOLL]: Yes, sir.

"THE COURT: We are gonna look at that grid. Before we do that, I should mention I have a copy of the second amended information in this case.

"Have you seen a copy of that?

"[KIRTDOLL]: Yes, sir.

"THE COURT: You have a right to have the Court read that—those charges to you. Do [you] wish me to read those charges to you?

3

"[KIRTDOLL]: No, sir.

"THE COURT: I'll show there has been a waiver of formal arraignment.

We are gonna look at the top grid. That is the grid for the nondrug felonies. On the left-hand side are the numbers one through ten. Those stand for the level of nondrug felonies in the State of Kansas. We are gonna look at number two. That is the level of the felony charged in Count 1, murder in the second degree, reckless. As you look across that grid horizontally, you will see the numbers range from a high of 493 months down to a low of 109 months.

"Your specific range is dependent upon your criminal history. Criminal history is set out by the letters 'A' through 'I'. Those appear at the top of your grid. If you look, if you had just a misdemeanor or no record at all, you would be considered an 'I' criminal history. If you follow that 'I' column down to where it intersects with row two, you will see that the range of your sentence would be 109 months and 123 months.

"If you have a higher criminal history, I am obligated to follow that. The highest criminal history would be an 'A' criminal history. If you were an 'A' criminal history and you follow that column down to where it intersects with row two, you will see that the range of your sentence is anywhere from 442 months to 493 months.

"Is that your understanding?

"[KIRTDOLL]: Yes, sir.

. . . .

"THE COURT: Next, we're gonna look at number three. That is the level of the felony that you are charged with in Count 4 in this case. If you look across the grid on the Level 3, you will see that the range of sentence is anywhere from 247 months down to 55 months. Again, if [your] criminal history is 'I', it's gonna be a range of 55 to 61 months. If your criminal history is higher, up to an 'A', it's gonna be a range of 221 to 247 months.

"Is that your understanding?

"[KIRTDOLL]: Yes, sir.

. . . .

"THE COURT: Do you have any questions about the potential sentence or fine in this case?

"[KIRTDOLL]: No, sir.

"THE COURT: Let me go over some of the constitutional rights that you're going to be waiving if you enter a plea in this case.

4

"You have a constitutional right to a jury trial. It would be a jury trial of 12 individuals, because you're charged with a felony offense. You would have the right to counsel, such as Ms. Asher, during the course of that jury trial. You would be presumed innocent during the course of that jury trial. You could testify on your own behalf.

. . . .

"You could testify on your own behalf, but nobody could force you to testify against your wishes. You could use the Court's subpoena power to bring witnesses to testify on your behalf, and through your counsel, you could cross-examine all of the accusers against you, the State's witnesses.

"If you enter a plea, you would be waiving all of those rights and any other constitutional rights you possess. Do you understand that?

"[KIRTDOLL]: Yes, sir.

"THE COURT: Do you understand that if you enter [a] plea, and I accept that plea and adjudge you guilty that there will not be a jury trial in this matter?

"[KIRTDOLL]: Yes, sir.

"THE COURT: Do you also understand, by entering a plea that you waive the right to appeal on any decisions I made on any prior motions that have been filed in this case, and you waive the right to have a jury hear the evidence in this case and make a determination?

"[KIRTDOLL]: Yes, sir."

The State then presented the factual basis for the charges, and the district court continued its discussion with Kirtdoll:

"THE COURT: Ms. Asher [Kirtdoll's counsel], do you agree if this matter proceeded to trial, the State could produce witnesses and evidence to support Count 1, second-degree reckless murder, and Count 4, aggravated robbery, beyond a reasonable doubt?

"MS. ASHER:  Yes, Your Honor.

"THE COURT: Mr. Kirtdoll, have you had sufficient time to talk to Ms. Asher about any potential defenses you might have to this charge?

"[KIRTDOLL]: Yes.

"THE COURT: Are you satisfied with her representation?

"[KIRTDOLL]: Yes.

"THE COURT: Do you have any questions of your counsel or the Court before I proceed to ask you for your plea?

"[KIRTDOLL]: No."

Having found that Kirtdoll understood the pleas and his rights; was not under the influence of drugs, alcohol, or medication; and the plea was knowingly, voluntarily, and intelligently made, the district court accepted Kirtdoll's guilty pleas to one count of reckless second-degree murder and one count of aggravated robbery.

*Kirtdoll's attempts to withdraw his pleas and the motions' evidentiary hearing*

Before sentencing, Kirtdoll filed two pro se motions to withdraw his pleas. In his first motion, Kirtdoll claimed he did not have enough time to consider his pleas. He also asserted that he felt pressured to take the plea offer because his attorney, Donna Asher, was soon retiring. According to Kirtdoll, Asher "wanted so badly to take this plea before" she retired. Kirtdoll stated: "I didn't truly understand my plea at all and I also feel like I was forced to take this plea."

In his second motion, Kirtdoll claimed he had been misled and taken advantage of because he had only one day to think about the plea deal offer. These motions led Asher to withdraw as Kirtdoll's counsel, after which the district court appointed new counsel. Subsequently, Kirtdoll's newly appointed counsel filed a memorandum in support of Kirtdoll's pro se motions.

The district court held an evidentiary hearing at which Kirtdoll and Asher testified. Kirtdoll testified that Asher met with him in jail, discussed the evidence against him, and told him that if he went to trial he would likely be convicted of felony murder and face a life sentence, with a minimum of 50 years in prison. Faced with the strong evidence

6

against him, Kirtdoll told Asher he would rather negotiate a plea deal than go to trial. He repeatedly authorized Asher to make different offers to the State which would allow him to obtain an on-grid sentence in order then to receive credit for good time served. Although Kirtdoll tried to negotiate for a sentence less than 30 years in prison, he said he eventually agreed to a sentence of 46 years.

Kirtdoll testified that on the day Asher presented him the plea agreement, she arrived at the jail, gave Kirtdoll the proposed plea agreement, and told him to think about the offer. Kirtdoll claimed Asher told him that, in her opinion, the plea agreement was a good deal. Although Kirtdoll said he knew Asher was preparing his case for trial, he claimed Asher pressured him to take the plea deal because she was about to retire. He also testified that he felt taken advantage of because Asher returned the day after she presented him with the offer and asked if he was going to take the deal.

Concerning the amount of time he agreed to serve, Kirtdoll testified he knew he was agreeing to 554 months' imprisonment and that he did not understand the sentence "until she explained it to me." But he also testified he could not recall whether he had asked Asher to explain how many years that was. However, Kirtdoll did acknowledge that he knew there are 12 months in a year, so when asked why he did not simply divide 554 months by 12 to calculate the number of years he was agreeing to serve, he responded, "I mean, I could have but I didn't though." On cross-examination, Kirtdoll admitted that prior to the plea hearing, Asher told him 554 months equaled approximately 46 years.

Asher testified that at the time of her representation of Kirtdoll, she was a public defender in the Northeast Kansas Conflicts Office for the Board of Indigent Defense Services. Asher had been a public defender her entire career, which began in 1986, during which she tried "at least" 20 cases in which a life sentence was a potential penalty.

7

Asher testified that she reviewed the discovery in Kirtdoll's case and concluded the State had a "pretty solid" case against Kirtdoll. She stated she discussed the facts with Kirtdoll and told him it was unlikely a jury would acquit him of felony murder or aggravated robbery. Kirtdoll asked her to engage the State in plea negotiations from the beginning of the case, and she complied with this request.

In July 2018, Asher asked the State to agree to a plea which contemplated a departure to a 10-year prison sentence; the State declined but countered with a deal which would have Kirtdoll plead solely to the first-degree felony-murder charge. Kirtdoll did not accept that offer. In January 2019, Asher asked the State if it would agree to a plea of second-degree murder with a joint request for a departure to 25 years in prison. The State declined the offer but, in return, presented the final agreement, which Kirtdoll accepted.

Asher recalled that the day she presented Kirtdoll with the plea offer, she visited him at the jail and provided him with a copy of the plea agreement. She explained to Kirtdoll that 554 months equaled roughly 46 years, the number of years his sentence would likely be. She also told him the maximum amount of good time credit he could receive and explained the actual length of his likely sentence he would have to serve after subtracting the good time credit. She testified at no time did Kirtdoll indicate to her that he did not understand her explanation of the length of his likely sentence. She recalled "the only thing he was concerned about was whether or not there might be a better plea coming at a later time." Asher perceived Kirtdoll's central focus was minimizing the amount of time he would have to spend in prison and told him she did not think the State would make a better offer, explaining that he was facing life in prison for the felony-murder count. According to Asher, after she said this, Kirtdoll said he wanted to accept the offer. Asher gave Kirtdoll time to think it over and planned to return the next day. When she returned the next day, Kirtdoll already had some of the plea agreement initialed.

Asher denied pressuring Kirtdoll into accepting the agreement. She also denied misleading him about the terms of the agreement, stating, "I was very clear about how much time he would be looking at." Asher testified she never suggested that Kirtdoll would receive anything less than the 554-month prison sentence. When the State asked if she advised Kirtdoll that the agreement was in his best interests, she responded:

> "I don't think I said that. I thought that the agreement was a lot of time but I try to let clients make their decisions so I don't pressure them. I might have said, 'This is the best I think we're going to get. This means that you could get released sometime and you might be so old when you get released and would certainly be less time than if you were to be convicted of felony murder. Of course there is the potential, if you went to trial, that the agg[ravated] robberies could be run consecutive to the life sentence so there could've been more serious consequences.'"

Finally, Asher denied she had any personal motivations that would have caused her to urge Kirtdoll to accept the plea offer. She explained that Kirtdoll's trial was scheduled for January 2019 and she was not retiring until March 8, 2019. Asher said that if the case had gone to trial, she would have represented Kirtdoll. Additionally, another attorney and an investigator in Asher's office were actively preparing for the trial.

*The district court's denial of Kirtdoll's motions to withdraw his pleas and his sentencing*

Ultimately, the district court denied Kirtdoll's motions to withdraw his pleas. The district court found Asher had the knowledge and experience to effectively represent Kirtdoll, noting her extensive experience in criminal law. It also found that Asher considered all the evidence against Kirtdoll, explained it to him, and told him she thought it was unlikely that a jury would acquit him of felony murder. The district court also found Kirtdoll had continuously sought a way to serve less time in prison, stating, "It was [Kirtdoll's] purpose, function, his goal, during this entire time period to obtain the best plea he could get." Accordingly, the district court was not concerned about the short

9

period of time between the final offer and Kirtdoll's pleas, concluding his repeated plea negotiations indicated he had had enough time to consider the final plea offer as he had been actively negotiating a plea agreement for months.

Further, the district court found Asher had not unfairly taken advantage of Kirtdoll. It found she did not advise Kirtdoll to take the plea, but she told him it was likely the best deal the State would offer. The district court determined Asher's impending retirement had no effect on the case because she was actively preparing to go to trial, which was scheduled before her retirement.

The district court found Kirtdoll understood the plea, citing its colloquy with Kirtdoll during the plea hearing, and concluded, "Quite simply he has now had second thoughts and would like to renegotiate the plea, he would like to do less time. But you don't get a second chance just because you've changed your mind."

On June 13, 2019, the district court sentenced Kirtdoll in accordance with the plea agreement to 493 months' imprisonment for reckless second-degree murder and 61 months' imprisonment for aggravated robbery, to be served consecutive to one another, for a total prison sentence of 554 months. Kirtdoll is eligible to earn up to 15 percent credit for good time served.

Kirtdoll timely appeals.

### DID THE DISTRICT COURT ERR IN DENYING KIRTDOLL'S PRESENTENCING MOTIONS TO WITHDRAW HIS GUILTY PLEAS?

Generally, we review a district court's decision to deny a presentencing motion to withdraw a guilty plea for an abuse of discretion. The movant bears the burden to prove the district court erred in denying the motion. "A judicial action constitutes an abuse of

10

discretion if (1) it is arbitrary, fanciful, or unreasonable; (2) it is based on an error of law; or (3) it is based on an error of fact." *State v. Frazier*, 311 Kan. 378, 381, 461 P.3d 43 (2020).

Additionally, we review the district court's factual findings to ensure they are supported by substantial competent evidence. "'Substantial competent evidence is "evidence which possesses both relevance and substance and which furnishes a substantial basis of fact from which the issues can reasonably be resolved."' [Citations omitted.]" *State v. Jenkins*, 311 Kan. 39, 45, 455 P.3d 779 (2020). When evaluating the evidence, we "[do] not reweigh the evidence or assess the credibility of witnesses." *State v. Galloway*, 311 Kan. 238, 245, 459 P.3d 195 (2020).

Kirtdoll argues that the district court erred in denying his motions to withdraw his pleas. Prior to sentencing, a defendant may withdraw his or her plea for "good cause shown." K.S.A. 2020 Supp. 22-3210(d)(1). When determining if a defendant has demonstrated good cause to withdraw a plea, we apply what are commonly known as the "*Edgar* factors" to the defendant's particular circumstances, asking: (1) if the defendant was represented by competent counsel; (2) if the defendant was misled, coerced, mistreated, or unfairly taken advantage of; and (3) if the plea was fairly and understandingly made. *Frazier*, 311 Kan. at 381; *State v. Edgar*, 281 Kan. 30, 36, 127 P.3d 986 (2006). Any other factors impacting a plea withdrawal are also considered. See *State v. Schaefer*, 305 Kan. 581, 588, 385 P.3d 918 (2016).

On appeal, Kirtdoll only argues that his pleas were not fairly and understandingly made and that the district court's findings were not supported by substantial competent evidence. Thus, he has abandoned the other arguments he raised below. See *State v. Gonzalez*, 307 Kan. 575, 592, 412 P.3d 968 (2018). Kirtdoll claims he "did not fully understand the terms" of the plea agreement before he entered it and "felt rushed" to do so.

11

However, the record reflects that Kirtdoll understood the plea agreement. According to Asher, Kirtdoll's motivation throughout the time his case was pending was to minimize his prison time. When Asher met with him to discuss the final plea offer, she provided him a copy and told him, in years, how much time he was agreeing to serve. She also calculated the maximum amount of good time credit he could receive. While Kirtdoll claimed he was not told the number of years he would be serving, Asher testified to the contrary. Clearly, the district court credited Asher's testimony over Kirtdoll's. See *Galloway*, 311 Kan. at 245 (appellate court does not assess credibility of witnesses). Additionally, even we could accept Kirtdoll's assertion that he was not advised of the length of his sentence in years, it is still obvious he was aware of what his sentence was in months and that there are 12 months in a year, defeating any colorable claim Kirtdoll misunderstood the length of his sentence.

The plea colloquy also demonstrates that Kirtdoll understood the amount of time he was agreeing to serve. The district court carefully walked Kirtdoll through the plea agreement and the sentencing grid to demonstrate to Kirtdoll how much time he would serve if he pled guilty to the amended charges. During this colloquy, Kirtdoll acknowledged that he understood the agreement as the district court went through each part of it. Moreover, Kirtdoll confirmed to the court he was not under the influence of drugs, alcohol, or medication. Such facts indicate that Kirtdoll's pleas were knowingly made because he had been "informed of all the charges and knew which counts would be dismissed in exchange for a plea and was informed of the possible sentence." See *State v. Plotner*, 290 Kan. 774, 779, 235 P.3d 417 (2010).

The record also indicates Kirtdoll's decision was not rushed. Kirtdoll complains that he only had one night to consider the plea offer, but that assertion is refuted by the entirety of the circumstances surrounding his acceptance of the plea offer. From the beginning of the case, Kirtdoll was aware the State had solid evidence to prove he was guilty of first-degree felony murder, among other crimes, which carried a hefty term of

12

imprisonment. Because of his criminal history score, his standard gridbox sentence for a severity level 1 crime, like his charge of felony murder, would have been 620 months. See K.S.A. 2017 Supp. 21-6804(a). As that sentence exceeded 300 months, he was not eligible for a hard 25 sentence but, instead, was subject to "a mandatory minimum term equal to the sentence established for a severity level 1 crime pursuant to the sentencing range," which calculates out to nearly 52 years' imprisonment. See K.S.A. 2017 Supp. 21-6620(b)(2). This sentence could not be reduced by the application of good time credits, and Kirtdoll would not be eligible for parole prior to serving the mandatory minimum term of imprisonment. See K.S.A. 2017 Supp. 21-6620(b)(2). At the young age of 25, Kirtdoll was very concerned with the length of time he would be in prison. He wanted an on-grid sentence so he could potentially reduce his time with good time credit, and he sought to serve under 30 years in prison. For approximately six months, Asher negotiated on his behalf with the State, with back and forth offers. Asher knew "the only thing [Kirtdoll] was ever concerned about was whether or not there might be a better plea coming at a later time." When Asher presented the final offer, Kirtdoll knew he was not going to get a better deal, so he accepted it. Kirtdoll's decision to accept the State's plea offer was not merely one night in the making; rather, he attempted for six months to secure the best deal possible.

Kirtdoll also complains that Asher's impending retirement made him feel pressured and rushed to accept the plea offer. The record on appeal does not support this assertion either. While Kirtdoll admits Asher testified she would have represented him at trial, he claims the record does not reflect he knew this information when he decided to plead. Contrary to this assertion, Kirtdoll testified at the evidentiary hearing on his motions that he knew Asher was not going to retire until March 2019 and the trial was scheduled to begin on January 29, 2019. Under these facts, Kirtdoll knew Asher's retirement would not have hindered her representation of him at trial. While Kirtdoll may have felt pressure to accept the State's offer, that pressure stemmed only from the criminal evidence against him, not from Asher.

13

The district court's findings of fact are supported by substantial competent evidence. Kirtdoll failed to successfully establish good cause to withdraw his pleas, and the district court did not abuse its discretion in denying Kirtdoll's motions to withdraw his pleas.

Affirmed.